CAMPEAU GOODSELL SMITH, L.C.
SCOTT L. GOODSELL, #122223
GREGORY J. CHARLES, #208583
WILLIAM J. HEALY, #146158
440 N. 1st Street, Suite 100
San Jose, California 95112
Telephone: (408) 295-9555
Facsimile: (408) 295-6606

ATTORNEYS FOR Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

HSR GENERAL ENGINEERING CONTRACTORS INC,

Debtor.

Case No. 10-58737

CHAPTER 11

**AMENDED MOTION TO APPROVE STIPULATION FOR USE OF CASH COLLATERAL[1]**

**Date:** July 27, 2011
**Time:** 2:00 p.m.
**Location:**
United States Bankruptcy Court
280 S. First St.
San Jose, CA 95113

To The Honorable Charles Novack; The Office of The United States Trustee; Heritage Bank of Commerce ("Heritage"); and all interested parties:

HSR GENERAL ENGINEERING CONTRACTORS INC ("Debtor" or "HSR")., hereby moves the Court for interim and final orders, pursuant to Bankruptcy Code Sections 361 and 363 and Federal Rule of Bankruptcy Procedure Rule 4001(b)-(d) for use of cash collateral ("Motion") as follows:

**I. Introductory Statement.**

The Debtor filed its voluntary chapter 11 petition on August 23, 2010. The Debtor continues to operate its business as a debtor-in-possession pursuant to 11 U.S.C. 1107 (a)

---

[1]Amended to correct date from July 25, 2011 to July 27, 2011.



Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 1 of 9

and 1108.

No committee of unsecured creditors has yet been appointed in this case, nor has any trustee or examiner.

On August 23, 2010, Debtor commenced this Chapter 11 bankruptcy proceeding. Debtor sought bankruptcy protection because one of Debtor's sureties issued stop notices on various projects thereby preventing Debtor from continuing with these projects, from receiving income on these projects, and paying various suppliers, vendors, and subcontractors. At the time of the commencement of this bankruptcy proceeding Debtor had two primary obligations to Heritage Bank of Commerce ("Heritage"–Heritage refers to both Debtor's obligation to Heritage and Debtor's obligation to the SBA which is administered by Heritage), including a primary loan with a pre-petition balance of approximately $1,415,879.00 and a line of credit with a pre-petition balance of approximately $273,075.00. Heritage recorded UCC liens against some of Debtor's assets, but Heritage did not perfect its rights relative to motor vehicles owned by Debtor.

On June 24, 2011, Heritage presented Debtor with a cash collateral proposal which Debtor subsequently accepted. Part of the agreement requires immediate payments to Heritage relative to Debtor's loan with Heritage and line of credit with the SBA and upon approval of the agreement a payment of additional monies to Heritage relative to the line of credit, and thereafter modified payments to Heritage in resolution of the line of credit and payments to Heritage relative to Debtor's loan with the SBA. The agreement also provides for a potential discount of Debtor's loan with Heritage and a mutual waiver of claims.

**II. Certification.**

**The undersigned Certifying Professional has read the accompanying motion or stipulation and the Cash Collateral-Post Petition Financing Introductory Statement; to the best of my knowledge, information, and belief, formed after reasonable inquiry, the terms of the relief sought in the motion or stipulation are in conformity with the Court's Guidelines for Cash Collateral and Financing Motions and Stipulations except as set forth above. I understand and Financing Motions and Stipulations except as set**


Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 2 of 9

**forth above. I understand and have advised the debtor in possession or trustee that the court may grant appropriate relief under Fed. R. Bankr. P. 9024 if the court determines that a material element of the motion or stipulation was not adequately disclosed in the Introductory Statement.**

**III. Jurisdiction.**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).The statutory predicate for the relief requested in Bankruptcy Code §§ 361 and 363 and Federal Rule of Bankruptcy Procedure Rule 4001(b).

**IV. Background.**

The Debtor filed its voluntary chapter 11 petition on August 23, 2010. As part of its initial filing Debtor filed various schedules listing its creditors. Debtor subsequently filed additional schedules addressing assets, income, and expenses.

HSR is a San Jose based general engineering contractor specializing in environmental and heavy civil construction. HSR is licensed by the State of California and has a hazardous supplemental certificate. During late 2009 through 2010 HSR began experiencing job related issues on at least two of its major projects which led to substantial claims and change order negotiations regarding those two projects. HSR submitted a federal claims termination statement on one project in excess of $1.2 million dollars that is in the process of resolution. This $4,000,000 project contained several dozen client design changes which extended the time for completion originally planned for September 30, 2009 through the winter months and into May 2010. During that time period HSR advised its client of ongoing costs of office overhead and other related costs and because the final design changes were still not complete in April, 2010 the client terminated HSR's contract for convenience. The project was 95% complete at that point. HSR hired a federal claims consultant to package and pursue the termination for convenience settlement on its behalf.

HSR's primary bonding company, Safeco (aka First National Insurance Company)


Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 3 of 9

placed a Stop Payment notice on all jobs then bonded by Safeco thus freezing all funds on projects bonded by Safeco making it impossible for HSR to pay vendors and subcontractors on those jobs. Based on the continuing problems with Safeco Mutual HSR began using a new surety to write public works surety bonds. Debtor sought bankruptcy protection because one of Debtor's sureties issued stop notices on various projects thereby preventing Debtor from continuing with these projects, from receiving income on these projects, and paying various suppliers, vendors, and subcontractors.

At the time of the commencement of this bankruptcy proceeding Debtor had two primary obligations to Heritage, including a primary loan with a pre-petition balance of approximately $1,415,879.00 and a line of credit with a pre-petition balance of approximately $273,075.00. Heritage recorded UCC liens against some of Debtor's assets, but Heritage did not perfect its rights relative to motor vehicles owned by Debtor.

Debtor and Heritage entered into two stipulations for use of cash collateral (Docket# 46 and 47) which were approved by the court (Docket#63 and 48, respectfully).

In December 2010 and January 2011 Debtor and Heritage finalized the accounting of the sale of collateral and non-collateral and payment relating to the cash collateral stipulation and order, payment of related sale expenses, and segregation. Heritage's accounting specifically acknowledged the sale of collateral and non-collateral. In summary, Heritage used $844,045.00 of the net sale proceeds of collateral to pay down part of Debtor's obligations to Heritage; Heritage released $196,080 of the net sale proceeds of non-collateral to Debtor which were segregated into a separate DIP account; Heritage initially held an additional $40,000 of the net sale proceeds of non-collateral (a Gradall 5200XL) asserting either this equipment should have been part of its collateral or Debtor had sold collateral pre-petition without payment to Heritage; and, after discussion and agreement, Heritage released $37,163.19 of the $40,000 to Debtor which was segregated into the separate DIP account holding unencumbered funds and applied $2,836.81 of the $40,000 to adequate protection payments Debtor had inadvertently underpaid.



Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 4 of 9

On or about June 2, 2011, Debtor received notice via email that Heritage had, inter alia, declared a default of the cash collateral agreement and frozen Debtor's Debtor-In-Possession accounts, including an account holding funds that were unencumbered funds, not part of Heritage's cash collateral, and not subject to the cash collateral agreements or orders. Said action by Heritage followed months of negotiation regarding cash collateral use.

On June 24, 2011, Heritage presented Debtor with a cash collateral proposal which Debtor subsequently accepted. Part of the agreement requires immediate payments to Heritage relative to Debtor's loan with Heritage and line of credit with the SBA and upon approval of the agreement a payment of additional monies to Heritage relative to the line of credit, and thereafter modified payments to Heritage in resolution of the line of credit and payments to Heritage relative to Debtor's loan with the SBA. The agreement also provides for a potential discount of Debtor's loan with Heritage and a mutual waiver of claims.

The most basic terms of the agreement between Debtor and Heritage are as follows:

1. As of June 29, 2011, the outstanding amount of principal and accrued and unpaid interest owing under the Revolving Loan was $206,182.73 and the outstanding amount of principal and accrued and unpaid interest owing under the SBA Term Loan was $481,706.63;

2. Upon Bankruptcy Court approval Debtor shall pay to Heritage the sum of $75,000 and such payment shall be applied (i) first, to bring current interest owing under the SBA Term Loan, (ii) second, to bring current interest owing under the Revolving Loan, and (iii) third, to a reduction in the principal balance of the Revolving Loan;

3. Not later than five calendar days of the Bankruptcy Court's approval Debtor will make an additional payment of $34,820 which sum shall be applied to obligations owing under the Revolving Loan thereby reducing the balance of the Revolving Loan to approximately $100,000;

4. Upon Bankruptcy Court approval and once the above described payments are made, Heritage will amortize the sum of $50,000 under the Revolving Loan over the

remaining term of the SBA Term Loan (which amortization will be at an interest of 5.5% and Debtor shall thereafter make monthly payments to Lender in the amount of $1,047.34 per month commencing on July 22, 2011 through December 22, 2019);

5. If and only if Debtor timely pays off and satisfies the $50,000 sum set forth herein by making the amortizing payments over the remaining term of the SBA Term Loan, then Heritage agrees to accept such payments in full satisfaction of the Revolving Loan but if Debtor fails to timely pay off and satisfy the $50,000 sum set forth herein by making the amortizing payments specified in this Section over the remaining term of the SBA Term Loan, then Lender shall apply the principal amount of the payments actually received by Lender under this Section against the approximately $100,000 balance of the obligations owing under the Revolving Loan, and the remaining balance of the obligations owing under the Revolving Loan shall continue to be due and owing in full;

6. Upon Bankruptcy Court approval and once the above described payments are made Heritage will re-amortize the then present balance of the SBA Term Loan over the remaining term of such SBA Term Loan (which amortization shall be at the same non-default rate specified in the SBA Term Loan Documents and shall be as more fully set forth in the SBA Term Loan Change in Terms Agreement), and Debtor shall thereafter continue to pay interest only of $2,025.00 per month commencing on July 5, 2011 and through December 5, 2011 and then commencing January 5, 2012 principal and interest of $6,122 per month through December 30, 2019;

7. Provided Debtor fully and timely pays and performs these obligations Heritage agrees to Debtor's continued use of cash collateral in accordance with the Stipulation For Use of Cash Collateral; and

8. A mutual release of claims by and between Debtor and Heritage based on matters prior to Bankruptcy Court approval.

**V. Relief Requested.**

By this Motion, the Debtor seeks interim and final orders, pursuant to Bankruptcy


Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 6 of 9

Code §§ 361 and 363 and Federal Rule of Bankruptcy Procedure 4001(b) approving the stipulation for use of cash collateral between Debtor and Heritage.

**VI. Basis For Relief and Legal Authority.**

**A. Cash Collateral.**

Heritage's interest are adequately protected by the Debtor's assets and the equity therein. If and to the extent that the Heritage's equity cushion diminishes as a result of the requested use of Cash Collateral, the Heritage will be adequately protected against such diminution by the granting of the Replacement Liens. The relief requested herein is consistent with the guidelines set forth in the Northern District of California Guidelines for Cash Collateral and Financing Stipulations (the "Cash Collateral Guidelines") and contains no provisions that would not normally be approved under those standards.

The continued operation of the Debtor's business will preserve the Debtor's equity ability to propose and confirm a plan of reorganization. The Debtor should have a reasonable opportunity to do so. It is well-established that a bankruptcy court, where possible, should resolve issues in favor of reorganization. Thus, in *Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.),* 727 F.2d 1017, 1019 (11th Cir. 1984), the court noted, "A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."

Especially in the early stages of a bankruptcy case, the bankruptcy court should resolve any doubt by offering the debtor a chance to reorganize and, therefore, should use going concern values. See, e.g., *In re Hoffman,* 51 Bankr. 42, 47 (Bankr. W.D. Ark. 1985); *In re A&B Heating & Air Conditioning, Inc.*, 48 Bankr. 401, 403-404 (Bankr. N.D. Fla. 1985); *In re Heatron, Inc.*, 6 Bankr. 493, 496 (Bankr. W.D. Mo. 1980). See, also, *In re Sun Valley Newspapers, Inc.*, 171 Bankr. 71, 75 (Bankr. 9th Cir. 1994) (the debtor should be given substantial latitude during the initial phase of the case if it is plausible that it can



Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 7 of 9

propose a confirmable plan). Courts have allowed the use of cash collateral to enhance or preserve a debtor's reorganization value, even where the secured party is undersecured. In *Stein v. United States Fanners Home Admin. (In re Stein),* 19 Bankr. 458, 460 (Bankr. E.D. Pa. 1982), the bankruptcy court allowed the use of cash collateral in this situation reasoning that the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]."

A debtor's use of estate property is governed by Bankruptcy Code § 363(c). Section 363 (c)(1) provides that a debtor may use estate property in the ordinary course of business without notice or hearing. Section 363(c)(2), however, provides that a trustee or debtor-in-possession "may not use, sell, or lease cash collateral … unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

The existence of an "equity cushion" or a "value cushion"—the value of the collateral in excess of the amount of the secured claim at issue—"is the classic form of protection for a secured debt," and it is well settled that "the existence of an equity cushion, standing alone, can provide adequate protection." *Pistole v. Mellor (In re Mellor),* 734 F.2d 1396, 1400 (9th Cir. 1984). The *Mellor* court held that an equity cushion of 20% constituted adequate protection as a matter of law.

The Bankruptcy Code also expressly provides that granting a replacement lien is a recognized method of providing adequate protection. Section 361(2) provides in pertinent part that "such adequate protection may be provided by … providing to such entity an additional or replacement lien to the extent that such use … results in a decrease in value of such entity's interest in such property …." Courts have also determined that replacement liens constitute adequate protection. *MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396 n.4 (10th Cir. 1987).

The Debtor proposes to grant a replacement lien to the Heritage in the collateral acquired post-petition of the same type as their pre-petition collateral. The Replacement Liens will be of the same priority, extent, and validity as any pre-petition liens and will


Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 8 of 9

secure any diminution in the value of the Cash Collateral resulting from the Debtor's use thereof. The Replacement Liens will be subordinated to the compensation and expense reimbursement (excluding professional fees) allowed to any trustee hereafter appointed in the case.

**VII. Conclusion.**

WHEREFORE, the Debtor requests that this Court enter an interim and final order authorizing the use of cash collateral as requested and for such further and additional relief as the Court deems appropriate and proper.

Dated: July 21, 2011

CAMPEAU GOODSELL SMITH
/s/ William J. Healy
William J. Healy


Case: 10-58737 Doc# 231-1 Filed: 07/21/11 Entered: 07/21/11 16:39:20 Page 9 of 9